(C. D. 1914)

ALLIED FOOD CORP. OF AM. *v.* UNITED STATES

## United States Customs Court, Third Division

(Decided September 18, 1957)

*Barnes, Richardson & Colburn* (*E. Thomas Honey* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Dorothy C. Bennett* and
*Murray Sklaroff*, trial attorneys), for the defendant.

Before JOHNSON, DONLON, AND RICHARDSON, Judges

RICHARDSON, Judge: Plaintiff seeks to have the entry of the merchandise involved in these two consolidated protests ("plastic papaya jelly base") reliquidated, contending that the collector's classification of it as "sugar after being refined, when tinctured, colored, or in any way adulterated," under the provisions of paragraph 506 of 19 U. S. C. § 1001 and subject to a duty of 40 per centum ad valorem, less the 20 per centum reduction provided for in the Cuban Trade Agreement, T. D. 47232, was in error; that the labeling of the merchandise by the exporter in Cuba as a "plastic jelly base" was a misnomer; and that the merchandise is dutiable under paragraph 751 of 19 U. S. C. § 1001, as modified by T. D. 47232, at 14 per centum ad valorem, either directly or by virtue of the similitude provision of paragraph 1559; or if the court should find that said paragraph 751 or 1559 are not applicable the merchandise then must be classified as a manufactured article, not specially provided for, under paragraph 1558, as modified by T. D. 47232, at 16 per centum ad valorem.

The merchandise consisted of 13,632 cartons, containing 6 blocks each of a solid mass of brownish color, 2½ inches in height, 6 inches in width, and 18 inches in length. Each block weighed 10 pounds. According to the label on the merchandise (defendant's exhibit A), it was described as a "Plastic Papaya Jellybase," containing "55% refined cane sugar—45% Papaya." According to the record, this ratio of the named ingredients was the same as that specified by the Food and Drug Administration of the Department of Agriculture for jams and jellies. In the manufacturing process, the water was removed and the merchandise reduced to a solid mass. It could be reconstituted by adding water and heating. In reconstituting the merchandise, the heat dissolves all of the sugar and leaves the papaya pulp diffused, forming either a jelly base, a jam base, a jelly, or a jam. The label on the merchandise described it as a "jelly base." A "base" is "the main or chief ingredient of anything, viewed as its fundamental element or constituent." Webster's New International Dictionary, second edition. The directions on the label said add water, heat, and "add commercial jellying powder or liquid." The consulting food

engineer and chemist, Dr. John A. Steffens, who supervised the production of the merchandise in Cuba for plaintiff, testified that the merchandise did not in fact contain any plastic material, but was called plastic because it had the consistency of stiff putty, that when the sugar was combined with the fruit pulp and boiled inversion occurred and it was no longer crystallized and did not resemble crystallized sugar, and that "It was just a jam with water out, that is all." (R. 39.) Defendant's exhibit B, the United States Customs Laboratory Report, describes the merchandise as "a dried unfiltered fruit juice with added sugar." It may be inferred from this report that should the fruit pulp be filtered and water added one would at least get a fruit jelly. Also, Dr. Steffens testified that a jelly is a filtered fruit juice only, without the pulp. (R. 42.) He stated that to make a jelly you take the pulp out and to make a jam you leave the pulp in. He stated the pulp was left in and the consistency reduced to a jam by heating and removal of water and that the consistency of the manufactured product was further reduced by dehydration until it formed a solid mass which is the merchandise in question. The production of the merchandise was described as follows:

Papaya, a large fruit, was picked and cut open, the seeds were removed, and the pulp was sliced. The pulp was placed in a kettle with steam jackets on it and sugar was added. The proportions by weight were 45 percent papaya pulp and 55 percent sugar. The pulp and sugar were melted down until the material consisted of 64 percent of solids by weight which produced a papaya jam, as defined by Government regulations. The papaya jam was heated to about 235 degrees Fahrenheit which reduced the moisture, causing the jam to become pasty. It was allowed to cool to 130 degrees Fehrenheit and then placed in forms and, after it had completely cooled, it was packed for shipment (R. 32, 33). All of the pulp of the papaya was used and it became completely disseminated throughout the product, making the finished product a brownish orange color. The papaya pulp consists of 10 percent solids and the balance is water (R. 32, 33). To reconstitute the product to a jam it was simply necessary to add the proper amount of water to the "plastic jelly base" and to heat it. Nothing was added but water and the jam was of a consistency a little heavier than Karo sirup. The process was similar to the addition of water to a soup concentrate to form a soup (R. 35). Papaya jam consists of 45 percent by weight of fruit pulp and 55 percent by weight of cane sugar, boiled down to a consistency of 63 or 64 percent of total solids.

The Summary of Tariff Information, 1929, page 1300, states:

Fruit jams and preserves are made by cooking fruit—fresh, canned or cold-packed—with sugar or with sugar and water. In their preparation not less than 45 pounds of fruit are used to each 55 pounds of sugar. Fruit jelly is the semi-solid product made by concentrating strained fruit juice, or water extract of the fruit, with sugar.

Webster's New International Dictionary, 1950 edition, gives the following definition:

jam, n. A product made by boiling fruit and sugar to a thick consistency, without preserving the shape of the fruit; * * *.

It seems clear from the record that the merchandise was not refined sugar, which has been colored, tinctured, or adulterated, but is at least a manufactured article. It should not be classified directly as a "jam," since it was dehydrated to a consistency below the jam stage. The merchandise does, however, according to the record, come within the scope of the similitude clause of paragraph 1559, since there exists a substantial similitude in material and use to jam. It contains the same ingredients as specified by the Department of Agriculture and as claimed by plaintiff's expert witness on foods, Dr. Steffens, as "jam with the water out." It falls within the definition of a fruit "jam with the water out," as defined in the 1929 Summary of Tariff Information and Webster's New International Dictionary, 1950 edition. After adding water and heating to a thick fluid consistency, the article could be used as a jam. We, therefore, hold that the dehydrated merchandise is dutiable under paragraph 751 of 19 U. S. C., § 1001, modified by T. D. 47232, at 14 per centum ad valorem, as a jam by similitude, since it is similar to papaya jam in material and use.

This decision is in line with *United States* v. *Rich*, 176 Fed. 732, T. D. 30357, where the United States Circuit Court of Appeals, Second Circuit, held that fruit juice from which water had been evaporated so that it had the consistency of a very thick sirup instead of a thin juice was dutiable by similitude to fruit juice. The court held that the concentrated fruit juice resembled ordinary fruit juice in material and resembled fruit juice in use since it was applied to the same purposes. See also *C. J. Tower & Sons* v. *United States*, 46 Treas. Dec. 151, T. D. 40374, where buttermilk, which had about 40 percent of the water removed, was held to be dutiable as buttermilk, and *Wakem* v. *United States*, 19 Treas. Dec. 869, T. D. 30845 (180 Fed. 1021), where it was held that bok ale, which, after importation, had to have water and carbonic acid added to prepare it for use as a beverage, was similar to beer in material and in the process of manufacture and was dutiable by similitude as beer, and *Cresca Co., Inc.* v. *United States*, 38 Cust. Ct. 211, C. D. 1864, where it was held that a soup preparation from which, by adding water and cooking, soup can be prepared, is, by similitude of use, a soup.

Judgment will be rendered accordingly.